STATE of Minnesota, Respondent,

v.

Marco Antonio Leon BARAJAS,
Appellant.

No. A11–0983.

Court of Appeals of Minnesota.

July 23, 2012.

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, MN; and Michelle Lawson, Acting Clay County Attorney, Moorhead, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by WRIGHT, Presiding Judge; ROSS, Judge; and MUEHLBERG, Judge.*

## OPINION

WRIGHT, Judge.

Appellant challenges his conviction of first-degree possession of methamphet-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

amine with intent to sell. He argues that the district court committed reversible error by (1) denying his motion to suppress evidence seized by the police during an unlawful search of his cellular telephone, (2) admitting in evidence three photographs recovered from his cellular telephone that were irrelevant and unfairly prejudicial, and (3) admitting in evidence drug-courier-profile testimony. We affirm.

## FACTS

On September 30, 2009, the landlord of a rental property in Moorhead reported a possible trespasser living in an unrented apartment unit on the property. Moorhead Police Officers Joshua Schroeder and Nicholas Wiedenmeyer responded to the report, proceeded to the apartment, and knocked on the apartment door. Appellant Marco Antonio Leon Barajas answered. Barajas spoke Spanish, spoke little English, and expressed difficulty understanding the officers. While at the apartment, Officer Schroeder contacted United States Border Patrol Agent Dan Dill because Barajas was unable to provide proof of his citizenship or lawful presence in the United States. After briefly speaking with Barajas via cellular telephone, Agent Dill, who is proficient in Spanish, advised Officer Schroeder that Barajas was unlawfully residing in the United States. At Agent Dill's direction, Officer Wiedenmeyer detained Barajas and removed him from the apartment.

Shortly thereafter, Officer Schroeder observed a red flip-style cellular telephone on the kitchen counter in the apartment. Officer Schroeder opened the cellular telephone and searched the digital photographs stored in the telephone's internal memory for the purpose of identifying the telephone's owner. While doing so, Officer Schroeder observed a photograph of Barajas lying on a bed with a large amount of money. Officer Wiedenmeyer subsequently re-entered the apartment with two additional cellular telephones that he recovered from a pat-down search of Barajas. Officer Schroeder gave Officer Wiedenmeyer the red cellular telephone, and Officer Wiedenmeyer transported Barajas to the Clay County Jail. Officer Wiedenmeyer also contacted the border patrol agents who were en route to the jail and advised them of the photograph found on Barajas's red cellular telephone.

Border patrol agents subsequently transported Barajas from the jail to the Border Patrol Station in Grand Forks, North Dakota. Agent Dill asked Barajas why he had three cellular telephones. Barajas responded that he "liked to collect them." Agent Dill presented Barajas with a form, written in English, granting consent to the border patrol agents to search Barajas's cellular telephones. Barajas signed the consent form. Agent Dill searched the red cellular telephone and found three photographs: one that depicts Barajas lying on a bed with a large amount of money surrounding him and two that depict only money. When asked about these photographs, Barajas explained that it was his son's "play money." Agent Dill also searched Barajas's wallet, which contained two bank deposit slips for $4,150 and $4,300 in cash respectively.

Border patrol agents advised the Moorhead police that Barajas may be involved in drug trafficking. Based on this information, Officers Schroeder and Wiedenmeyer returned to the apartment where Barajas, a trespasser in the apartment, had been detained, and the property owner consented to a search of the apartment. The police recovered five plastic bags containing a white crystal substance, a digital scale, powdered milk, salt, an empty sugar container, motor oil, razor blades, an "SD

card" that can be physically moved from one cellular telephone to another for the purpose of transferring data, a fourth cellular telephone, and packaging materials, including tin foil, plastic bags, plastic wrap, and electrical tape.

On October 1, 2009, Barajas was charged with first-degree possession of methamphetamine with intent to sell, a violation of Minn.Stat. § 152.021, subd. 1(1) (2008). Barajas moved to suppress the three photographs that the police obtained from his cellular telephone.[1] At the suppression hearing that followed, Officer Schroeder testified that he found the cellular telephone on the kitchen counter, observed no identifying material on the outside or on the initial "home screen," and searched the photographs stored in the cellular telephone's internal memory to identify its owner. Officer Schroeder also testified that, at that time, the police did not suspect that Barajas was involved with controlled substances.

On March 18, 2010, the district court granted Barajas's suppression motion in a written order. The district court concluded that an "intentional invasion into the contents of an electronic device" by the police, which requires an "intentional search ... or other deliberate key strikes," must be supported by either a warrant or an exception to the warrant requirement. The district court also concluded that Officer Schroeder's warrantless search of Barajas's cellular telephone did not fall under the search-incident-to-arrest exception to the warrant requirement because no exigency existed, Barajas had already been removed from the premises at the time of the search, and the telephone was not contraband, an instrumentality of trespassing, or a weapon affecting officer safety.[2]

In January 2011, one day before the start of trial, the state moved the district court to reconsider the admissibility of the three suppressed photographs in light of the written consent form that Barajas signed of which the district court previously was unaware.[3] Barajas contended that these photographs constitute "fruit of the poisonous tree" and should remain suppressed because Agent Dill did not obtain Barajas's consent until after Officer Schroeder unlawfully searched his cellular telephone. On reconsideration, the district court denied Barajas's motion to suppress,

1. All of the photographs at issue here were recovered from the red flip-style cellular telephone that Officer Schroeder recovered from the kitchen counter of the apartment where the police detained Barajas.

2. Although unnecessary to its decision, the district court also adopted the reasoning of a recent Ohio Supreme Court decision, *State v. Smith*, 124 Ohio St.3d 163, 920 N.E.2d 949 (2009), and concluded that a cellular telephone is entitled to heightened protection from unreasonable searches and seizures— namely, a showing of officer safety concerns or exigent circumstances present at the time of search—because of the unique nature of a cellular telephone and its private contents. *But see United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973) (explaining that police authority to search person incident to lawful arrest "does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found on the person of the suspect" because "[i]t is the fact of the lawful arrest which establishes the authority to search").

3. The state also submitted a search warrant for Barajas's cellular telephone that the police had obtained from a different district court judge approximately five weeks after the district court issued its March 18, 2010 suppression order. But the district court did not consider this warrant, observing that the warrant application relied on incomplete information. The district court also admonished the police for "going behind the [district court]'s back and trying to get evidence ... that [the district court] already suppressed."

concluding that the signed consent form justified Officer Schroeder's warrantless search. The district court did not address Barajas's "fruit-of-the-poisonous-tree" argument or his assertion that Agent Dill did not obtain Barajas's consent until after Officer Schroeder searched the cellular telephone.

At the jury trial that followed, the police testified about items recovered from the apartment where they arrested Barajas. A forensic scientist with the Minnesota Bureau of Criminal Apprehension (BCA) testified that the five plastic bags contained methamphetamine with a combined weight of 387.2 grams. Another BCA employee testified that Barajas's fingerprint was on one of the bags of methamphetamine. Moorhead Police Officer Adam Torgerson testified that methamphetamine has a higher street value in Moorhead than in other parts of the United States or Mexico, and that the street value of methamphetamine increases when "cutting agents" are added, such as dry milk, salt, or sugar. In addition, Officer Torgerson explained the significance of the prepaid cellular telephones, SD card, packaging materials, and bank receipts recovered from Barajas and the apartment by explaining how and why those items are used by drug traffickers. The state also presented the three photographs obtained from Barajas's cellular telephone.

Barajas testified that he arrived in the Moorhead area in early September 2009, stayed in a hotel, and was paid in cash for work he performed at a horse park. Barajas began living in the apartment three days before he was detained. He typically left the apartment only to purchase groceries and to work from approximately 6:00 a.m. until approximately 4:00 or 5:00 p.m. He suspected that other people entered the apartment when he was away. Also, on one occasion when two men attempted to enter the apartment while Barajas was present, Barajas locked them out. Barajas testified that the methamphetamine recovered from the apartment did not belong to him and that he was not carrying it for anyone else. He explained that he used the plastic bags and food items to prepare food, the razor blades for work, and the prepaid cellular telephones because he lacked the identification required to purchase a telephone contract. He also testified that the money in the photographs on his cellular telephone belonged to a man named Frank. A Spanish-speaking special agent with the Department of Homeland Security testified that Barajas had advised him that Frank paid Barajas to deposit money into bank accounts.

The jury found Barajas guilty of first-degree possession of methamphetamine with intent to sell, and the district court sentenced Barajas to 74 months' imprisonment. This appeal followed.

## ISSUES

I. Did the district court err by denying appellant's motion to suppress evidence obtained by the police during a warrantless search of appellant's cellular telephone?

II. Did the district court err by admitting in evidence photographs recovered from appellant's cellular telephone that were irrelevant and unfairly prejudicial?

III. Did the district court err by admitting in evidence drug-courier-profile testimony?

## ANALYSIS

### I.

The district court denied Barajas's motion to suppress the three photographs that the police obtained from Barajas's cellular telephone because it determined

that the consent form that Barajas signed justified Officer Schroeder's warrantless search. Barajas challenges this decision on appeal.

### A.

■ As a threshold matter, Barajas's argument requires us to determine whether Officer Schroeder's warrantless search of Barajas's cellular telephone was constitutionally reasonable. Whether a search of the contents of a cellular telephone by the police is constitutionally reasonable absent a warrant or an exception to the warrant requirement is an issue of first impression in Minnesota. We review de novo whether a warrantless search by the police is constitutionally reasonable. *State v. Burbach,* 706 N.W.2d 484, 487 (Minn. 2005).

■ The United States Constitution and the Minnesota Constitution prohibit unreasonable government searches and seizures of "persons, houses, papers, and effects." U.S. Const. amend. IV; Minn. Const. art. I, § 10. To assert a violation of these constitutional protections, (1) the search must be of an area in which the person has an expectation of privacy and (2) the person's expectation of privacy must be one that is recognized within society as reasonable. *In re Welfare of B.R.K.,* 658 N.W.2d 565, 571 (Minn.2003). The first of these inquiries requires the person invoking these constitutional protections to demonstrate a subjective expectation of privacy. *Id.* The second of these inquiries requires the person to demonstrate that the expectation of privacy is reasonable. *Id.*

### 1.

■ When determining whether a person has exhibited a subjective expecta-

tion of privacy, "courts should focus their inquiry on the individual's conduct and whether the individual '[sought] to preserve [something] as private.'" *Id.* (quoting *Bond v. United States,* 529 U.S. 334, 338, 120 S.Ct. 1462, 1465, 146 L.Ed.2d 365 (2000)). A person's attempt to conceal activities or items may establish a subjective expectation of privacy. *Id.* at 572. In *B.R.K.,* the Minnesota Supreme Court found that the appellant demonstrated an "actual subjective expectation of privacy" in a third party's home by turning off lights, turning down the television volume, locking outside doors to the home, and hiding behind a furnace in the basement. *Id.* A person's attempt to conceal activities or items need not involve locks or pose a difficult obstacle; indeed, the *B.R.K.* court relied on federal cases in which individuals were found to have exhibited a subjective expectation of privacy by using an enclosed telephone booth, hiding drugs in a basement, or closing a door and covering a window. *Id.*

■ Here, Barajas stored the challenged photographs on a cellular telephone that he kept close to him [4] and inside the apartment where he was residing. The record does not demonstrate that Barajas transmitted or otherwise shared these photographs with other individuals or the telephone service provider. *Cf. State v. Gail,* 713 N.W.2d 851, 860 (Minn.2006) (concluding that defendant, who sublet a cellular telephone, did not have a reasonable expectation of privacy in cellular telephone records when the telephone service provider held the challenged records and defendant's call history was exposed via the "Caller ID" function on the cellular telephones of defendant's call recipients).

---

4. The record reflects that, when the police arrived at the apartment, Barajas was preparing food in the kitchen near the location where Officer Schroeder found the cellular telephone.

Nor did Barajas expose the challenged photographs to the public or the police. Officer Schroeder testified that he had to open Barajas's flip-style cellular telephone, which concealed the display screen, preventing a view of the telephone's digital contents. Officer Schroeder also testified that he found no identifying information on the telephone's initial display screen. Rather, accessing the challenged photographs required him to make deliberate key strikes and navigate the cellular telephone's digital contents, which establishes that the photographs were digitally concealed within the cellular telephone's internal memory. Under these circumstances, we conclude that Barajas demonstrated an actual subjective expectation of privacy in the contents of his cellular telephone.

### 2.

■ We next consider whether Barajas's expectation of privacy is one that is recognized within society as reasonable. In doing so, we consider both whether Barajas had a reasonable expectation of privacy in the apartment in which he was a trespasser and whether he had a reasonable expectation of privacy in the digital contents of his cellular telephone.

■ The constitutional right to be free from unreasonable searches and seizures protects what a person " 'seeks to preserve as private, even in an area accessible to the public.' " *State v. Thompson,* 788 N.W.2d 485, 497 (Minn.2010) (Page, J.,

concurring) (quoting *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). A person may have a reasonable expectation of privacy in a place other than the person's home. *Minnesota v. Olson,* 495 U.S. 91, 96, 110 S.Ct. 1684, 1687–88, 109 L.Ed.2d 85 (1990). But a person occupying a property as a trespasser ordinarily has no reasonable expectation of privacy in that place. *See Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978). A reasonable expectation of privacy "means more than a subjective expectation of not being discovered. A burglar ... may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate' " or "that society is prepared to recognize as 'reasonable.' " *Id.* (quotation omitted).[5] Moreover, exposing items to the public—even in an individual's home or office—or leaving items in an area readily accessible to others may render the individual's expectation of privacy in those items unreasonable. *California v. Greenwood,* 486 U.S. 35, 40–41, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988) (holding that homeowner lacked constitutionally protected reasonable expectation of privacy in garbage placed in opaque bags outside home for collection by garbage collector). It is undisputed that Barajas unlawfully resided in the apartment where the police arrested him and found his cellular telephone. Therefore, Barajas

**5.** *See also United States v. Jones,* 213 F.3d 1253, 1260 (10th Cir.2000) (holding that society is not prepared to recognize as reasonable defendant's expectation of privacy in premises when defendant was invitee of woman he knew was not the owner and when both gained unlawful entry to premises); *United States v. McRae,* 156 F.3d 708, 711 (6th Cir. 1998) (defendant lacked reasonable expectation of privacy in vacant house that he occupied for a week but did not own or rent); *United States v. Gale,* 136 F.3d 192, 195

(D.C.Cir.1998) (defendant lacked reasonable expectation of privacy in unoccupied apartment that he occupied "solely for the business of packing for distribution of narcotics ... without permission of its tenant" (quotation omitted)); *United States v. Pitt,* 717 F.2d 1334, 1337–38 (11th Cir.1983) (defendant lacked reasonable expectation of privacy in room where he was a trespasser and "lock[ed] a door which he had no legal right to lock on the premises of another and without the owner's consent").

lacked a reasonable expectation of privacy in the apartment.

■ This conclusion does not end our analysis, however. We are mindful that the challenged photographs were contained within a cellular telephone. Ordinarily, an individual can reasonably expect that the concealed contents of a closed container will remain free from public inspection, and government intrusion into such containers generally requires a warrant. *United States v. Jacobsen,* 466 U.S. 109, 120 n. 17, 104 S.Ct. 1652, 1660 n. 17, 80 L.Ed.2d 85 (1984) (observing that "[a] container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant"). Such protection is afforded to "the owner of every container that conceals its contents from plain view." *United States v. Ross,* 456 U.S. 798, 822–23, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982); *cf. Arkansas v. Sanders,* 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979) (providing that contents of closed containers are not shielded from warrantless intrusion if the container's outward appearance betrays its contents), *overruled on other grounds, California v. Acevedo,* 500 U.S. 565, 579, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991). Even when government agents may lawfully seize a closed container to prevent its loss or destruction, "the Fourth Amendment requires that they obtain a warrant before examining the contents." *Jacobsen,* 466 U.S. at 114, 104 S.Ct. at 1657.

■ This constitutional protection extends to items "thus closed against inspection, *wherever they may be.*" *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878) (emphasis added) (recognizing Fourth Amendment protection of sealed letters or packages in the mail); *see also United States v. Van Leeuwen,* 397 U.S. 249, 251, 90 S.Ct. 1029, 1031–32, 25 L.Ed.2d 282 (1970) (reaffirming this principle). Indeed, an individual does not necessarily relinquish the constitutional protection afforded to the concealed contents of a closed container by taking the container to a location in which the individual lacks a reasonable expectation of privacy. *See Bond,* 529 U.S. at 338–39, 120 S.Ct. at 1465 (holding that defendant retained some privacy interest in contents of bag brought onto public bus); *United States v. Owens,* 782 F.2d 146, 150 (10th Cir.1986) (holding that holdover guest's luggage left in motel room retained Fourth Amendment protection even though motel had legal right to forcibly evict holdover guest); *State v. Mooney,* 218 Conn. 85, 588 A.2d 145, 161 (1991) (holding that defendant retained reasonable expectation of privacy in contents of duffle bag and cardboard box located under highway bridge where he was living). Our careful research, however, has identified no published decisions in Minnesota articulating whether a cellular telephone may be treated as a closed container, the digital contents of which are protected from unreasonable government searches. The facts and circumstances here require us to address this matter of first impression.

■ The origin of the protection afforded to closed containers is *Ex parte Jackson,* in which the United States Supreme Court held that the contents of sealed letters or packages in the mail cannot be searched by government agents without a warrant. 96 U.S. at 733. Since then, the United States Supreme Court has explained that the general rule protecting the contents of closed containers applies broadly to all types of containers because "a constitutional distinction between 'worthy' and 'unworthy' containers would be improper." *Ross,* 456 U.S. at 822, 102 S.Ct. at 2171. As the *Ross* court observed, "a traveler who carries a tooth-

brush and a few articles of clothing in a paper bag or knotted scarf [may] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case." *Id.* Similarly, person's privacy interest in the contents of a cellular telephone is not diminished by virtue of those contents' digital format. *See Katz,* 389 U.S. at 352–53, 88 S.Ct. at 512 (rejecting claim that Fourth Amendment protects only tangible property); 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.6(f) (4th ed.2004) (observing that the *Katz* holding suggests that digital information may be protected from unreasonable searches). A cellular telephone that conceals its contents is consistent with the broad definition of constitutionally protected containers described in *Ross.*

Moreover, rapid advancements in cellular-telephone technology have broadened the capabilities of telephones beyond communication to include the creation and storage of private data that the owner does not intend for others to view. Cellular telephones are capable of storing substantial amounts of private data, including address books and photographs. *Smith,* 920 N.E.2d at 954–55; *see also State v. Ferguson,* 804 N.W.2d 586, 591–92 (Minn. 2011) (recognizing contacts list from cellular telephone as evidence). Here, the record clearly establishes that Barajas's cellular telephone is capable of taking and storing digital photographs. For the purpose of determining the constitutionality of a police search, we cannot identify a meaningful distinction between the digital photographs stored in Barajas's cellular telephone and the personal items stored in the paper bag contemplated by the United States Supreme Court in *Ross.*

We are mindful that, because cellular telephones are capable of sharing information with the public or third parties, the contents of a cellular telephone are not always truly concealed. *See Gail,* 713 N.W.2d at 860 (concluding that defendant lacked reasonable expectation of privacy in cellular telephone call history because defendant sublet the cellular telephone and the records were held by the telephone service provider and exposed via the "Caller ID" function on the cellular telephone of defendant's call recipient); *Smith,* 920 N.E.2d at 954 (observing that some cellular telephones can transmit or receive text messages and other data and access the Internet). And the contents of closed containers are not shielded from warrantless intrusion if the container's outward appearance betrays its contents. *Sanders,* 442 U.S. at 764 n. 13, 99 S.Ct. at 2593 n. 13. But these circumstances are not before us.

▮ Here, the record does not demonstrate that Barajas shared the challenged photographs with the public or third parties or that the cellular telephone betrayed its contents.[6] Accessing the challenged photographs required Officer Schroeder to physically open the cellular telephone, make deliberate key strikes, and navigate the telephone's internal memory. Under these circumstances, Barajas had a reasonable expectation of privacy in the challenged photographs because they were concealed from plain view within his cellular telephone.

▮ In sum, we conclude that a person has the same reasonable expectation of privacy in the concealed digital contents of a cellular telephone as a person has in the

---

**6.** We do not address whether a person has a reasonable expectation of privacy in a digital photograph visible on the initial display screen of a cellular telephone.

concealed physical contents of a container.[7] Accordingly, the police were required to obtain a search warrant before searching for photographs concealed within Barajas's cellular telephone.

## B.

Generally, warrantless searches by the police are per se unreasonable, unless they fall within a judicially recognized exception. *State v. Hardy,* 577 N.W.2d 212, 216 (Minn.1998) (citing *Katz,* 389 U.S. at 357, 88 S.Ct. at 514). All evidence obtained during an unlawful search is inadmissible to support a conviction unless an exception to the exclusionary rule applies. *James v. Illinois,* 493 U.S. 307, 311, 110 S.Ct. 648, 651, 107 L.Ed.2d 676 (1990); *State v. Lozar,* 458 N.W.2d 434, 438 (Minn.App.1990), *review denied* (Minn. Sept. 28, 1990). If the police conduct a warrantless search, "[t]he state bears the burden of showing that at least one exception applies, or evidence seized without a warrant will be suppressed." *State v. Metz,* 422 N.W.2d 754, 756 (Minn.App.1988).

The district court denied Barajas's motion to suppress the challenged photographs based on the signed written consent form that Agent Dill obtained from Barajas.[8] An individual's consent to be searched is a well-settled exception to the warrant requirement. *State v. Hanley,* 363 N.W.2d 735, 738 (Minn.1985). To be valid, such consent must be "freely and voluntarily" given. *State v. George,* 557 N.W.2d 575, 579 (Minn.1997). Barajas contends that the district court's reliance on the written consent form is erroneous because consent procured after an unlawful search has occurred cannot retroactively purge unlawfully obtained evidence of the taint that otherwise demands exclusion of that evidence. Alternatively, Barajas argues that his consent was neither freely nor voluntarily given.

When reviewing a pretrial order on a motion to suppress evidence, we review the district court's factual findings for clear error, giving due weight to the inferences the district court draws from those facts, but we determine as a matter of law whether the district court erred in suppressing—or not suppressing—the evidence. *State v. Diede,* 795 N.W.2d 836, 849 (Minn.2011).

The district court concluded, and the state maintains, that the unlawfulness of Officer Schroeder's search was cured by the consent form that Agent Dill subsequently obtained from Barajas. When the police obtain a person's consent to search after unlawful police conduct has occurred, the state must demonstrate both (1) that the subsequently obtained consent was voluntarily given and (2) that the connection between the unlawful conduct and the evidence is so attenuated as to dissipate the evidence of the "taint" of the unlawful conduct. *United States v. Lakoskey,* 462 F.3d 965, 975 (8th Cir.2006); *accord State v. Weekes,* 312 Minn. 1, 8–10, 250 N.W.2d 590, 594–95 (1977) (recognizing this rule in

---

**7.** We need not reach the district court's broader conclusion that a cellular telephone is entitled to *greater* constitutional protection than other containers, and we decline to do so under the circumstances presented here.

**8.** The parties do not contest the district court's conclusion that the search-incident-to-arrest exception to the warrant requirement is inapplicable here. Our opinion assumes

without discussion that this conclusion is correct. We nonetheless observe that the record supports the district court's findings that no exigent circumstances existed at the time that Officer Schroeder accessed the photographs on Barajas's cellular telephone and that the search occurred after Barajas had been removed from the premises.

the context of an incriminating statement obtained during unlawful confinement); *see also State v. Olson,* 634 N.W.2d 224, 229 (Minn.App.2001) (citing *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)) (observing that evidence obtained by exploiting previous unlawful conduct is inadmissible), *review denied* (Minn. Dec. 11, 2001).

 We first address whether Barajas's consent was voluntary. A person's consent to a search by the police must be "voluntarily given, without coercion or submission to an assertion of authority." *State v. Dezso,* 512 N.W.2d 877, 880 (Minn. 1994). Whether consent was voluntary is a question of fact subject to a totality-of-the-circumstances analysis. *Id.* "Although a person who has been seized may still voluntarily consent, [appellate courts] infer consent less readily after a seizure because once arrested, a person becomes more susceptible to police duress and coercion." *Diede,* 795 N.W.2d at 847 (quotation omitted).

Here, a border patrol agent presented Barajas with a consent form after the Moorhead police had questioned Barajas, detained him, confiscated his wallet and cellular telephones, and transported him to the Clay County Jail, *and* after border patrol agents subsequently transported him to a border patrol station in Grand Forks and questioned him further. Barajas also was in a vulnerable position because of his citizenship status, his lack of proficiency in English, and the absence of a neutral interpreter. Although the English-language consent form was presented to Barajas by a border patrol agent who is proficient in Spanish, the record is silent as to whether that agent explained to Barajas in Spanish that he had a right to refuse to consent, confirmed that Barajas understood this right, or precisely translated the consent form as opposed to summarizing its contents. On this record, we cannot conclude that Barajas's consent was voluntarily given and was not the product of coercion or submission to an assertion of authority.

 Even if Barajas's consent were voluntary, the state also must demonstrate that the connection between the unlawful conduct and the challenged evidence is so attenuated as to dissipate the "taint" of the unlawful conduct. *Lakoskey,* 462 F.3d at 975; *Weekes,* 312 Minn. at 8–10, 250 N.W.2d at 594–95. When determining whether the taint is purged from unlawfully obtained evidence, we consider "(1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Becker,* 333 F.3d 858, 862 (8th Cir.2003) (citing *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975)); *accord Weekes,* 312 Minn. at 9–10, 250 N.W.2d at 595 (recognizing these factors).

Regarding the first factor, the record reflects that Barajas signed the written consent form approximately three hours after Officer Schroeder searched Barajas's cellular telephone, which weighs in favor of concluding that the taint of the unlawful conduct was purged. *See Becker,* 333 F.3d at 862 (concluding that consent obtained 19 minutes after defendant's detention became unlawful was not too close in time to render consent invalid). As to the second factor, the state has not identified intervening circumstances during those three hours that would have led the police independently to discover the challenged photographs. The state has not established that either the police or the border patrol agents would have sought Barajas's consent to search his cellular telephone *but for* Officer Schroeder's discovery of the

challenged photographs. Officer Schroeder testified that the police did not suspect that Barajas was involved with controlled substances when he searched Barajas's cellular telephone; and the state has not suggested that the investigation of Barajas's trespass or unlawful-immigration offense would have been furthered by a search of his cellular telephone.

Addressing the third factor—the purpose and flagrancy of the official misconduct—the record reflects that Officer Schroeder searched Barajas's cellular telephone to determine whether it belonged to Barajas, not to find incriminating evidence. But Officer Schroeder's unlawful search involved a deliberate invasion of the contents of Barajas's property and a complete disregard of Barajas's privacy. Moreover, permitting the police to obtain consent *after* conducting an unlawful search so as to circumvent the exclusionary rule, even if the police conducted the unlawful search in good faith, would undermine the constitutional limitation on unreasonable searches and the purpose of the exclusionary rule. *See Hardy*, 577 N.W.2d at 217 (stating that "the primary purpose of the exclusionary rule is to deter police misconduct" by eliminating temptation for police officers to proceed with less than constitutional prerequisites for search and seizure); *see also State v. Jackson*, 742 N.W.2d 163, 180 n. 10 (Minn.2007) (observing that Minnesota Supreme Court has "consistently declined to adopt, much less even address, the [federal] 'good faith' exception" to the exclusionary rule). Therefore, we afford little weight to Officer Schroeder's good-faith motive for searching Barajas's cellular telephone.

Because the state has not demonstrated that Barajas's consent was voluntarily given or that the "taint" of the unlawful conduct had been purged, the district court's decision to admit the photographs based on consent was error.

 We alternatively address the state's reliance on the written consent form as an assertion of either the inevitable-discovery doctrine or the related independent-source doctrine, which provide exceptions to the exclusionary rule when the police inevitably would have obtained the evidence absent any misconduct or could have obtained the evidence based on information independent of their illegal conduct. *See Nix v. Williams*, 467 U.S. 431, 448–50, 104 S.Ct. 2501, 2511–12, 81 L.Ed.2d 377 (1984); *Wong Sun*, 371 U.S. at 485, 83 S.Ct. at 416; *State v. Richards*, 552 N.W.2d 197, 203–04 n. 2 (Minn.1996) (comparing these doctrines). The inevitable-discovery doctrine applies when officers "possess[ ] lawful means of discovery and [are], in fact, pursuing those lawful means prior to their illegal conduct." *State v. Hatton*, 389 N.W.2d 229, 233 (Minn.App.1986), *review denied* (Minn. Aug. 13, 1986). The independent-source doctrine does not apply absent a separate investigation that inevitably would have led police to discover the evidence. *Richards*, 552 N.W.2d at 203–04 n. 2.

Here, the police were not pursuing lawful means to obtain the challenged photographs from Barajas's cellular telephone before Officer Schroeder's unlawful search. The police were investigating a trespass and detained Barajas because of his citizenship status. The record does not establish that the police required the contents of Barajas's cellular telephone to aid in their investigation of either the trespass or the unlawful-immigration offense. Moreover, the state has not demonstrated the existence of a separate investigation that inevitably would have led the police to discover the challenged photographs. Therefore, neither the inevitable-discovery doctrine nor the independent-source doc-

trine justifies the district court's decision to admit the unlawfully obtained photographs in evidence.

Because the state has not demonstrated the existence of an exception to the warrant requirement, the district court erred by denying Barajas's motion to suppress the challenged photographs.[9]

"A constitutional error does not mandate reversal and a new trial if . . . the error was harmless beyond a reasonable doubt." *State v. Caulfield*, 722 N.W.2d 304, 314 (Minn.2006); *State v. Morrison*, 351 N.W.2d 359, 361 (Minn. 1984) (concluding that district court's error in denying defendant's motion to suppress evidence was harmless beyond a reasonable doubt). When applying the harmless-error standard to the erroneous admission of evidence, we determine "whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994). If there is a reasonable possibility that the verdict might have been more favorable to the defendant without the evidence, then the error is prejudicial. *Id.* The inquiry is not whether enough evidence exists to support the jury's guilty verdict without the challenged evidence, but rather, what effect the challenged evidence had on the jury's verdict and "whether the jury's verdict is surely unattributable" to the erroneously admitted evidence. *State v. King*, 622 N.W.2d 800, 811 (Minn.2001) (quotation omitted). The state bears the burden of persuasion under the harmless-error analysis. *State v. Reed*, 737 N.W.2d 572, 583–84 (Minn.2007).

Here, the challenged photographs permitted the state to demonstrate that Barajas possessed a large amount of money and to impugn Barajas's credibility by demonstrating that he provided the police with inconsistent explanations regarding the money depicted in the photographs. But the state established that Barajas possessed a large amount of money through otherwise admissible evidence, including bank-transaction and wire-transfer receipts, which demonstrated that Barajas had access to and transferred or deposited more than $8,000 in the short time that he was in the Moorhead area. And in his closing argument, defense counsel addressed possible concerns regarding Barajas's credibility by explaining that Barajas had consistently maintained his innocence to the police as to the drug offense and attributing Barajas's nervousness to his citizenship status.

In addition, the impact of the three challenged photographs is substantially outweighed, both in quantity and significance, by the ample physical and circumstantial evidence supporting the guilty verdict. The state demonstrated that the police recovered a digital scale and five bags containing large quantities of methamphetamine from the apartment. The plastic bags contained methamphetamine with a combined weight that is nearly 40 times the minimum amount necessary to support a conviction of first-degree controlled substance crime for sale of methamphetamine. *See* Minn.Stat. § 152.021, subd. 1(1). And Barajas's fingerprint was found on one of the bags of methamphetamine. This evidence and Barajas's possession of cutting

9. We observe that Barajas does not seek to suppress the physical evidence subsequently obtained from the apartment, nor does he characterize that evidence as the "fruit" of Officer Schroeder's search of Barajas's cellular telephone. Moreover, Barajas did not challenge the admission of this evidence in the district court. Therefore, we do not address the admissibility of evidence obtained from the apartment after Officer Schroeder searched Barajas's cellular telephone.

agents, multiple prepaid cellular telephones, and packaging materials, amply support the jury's guilty verdict. Moreover, the state's closing argument focused exclusively on this other evidence without ever referring to the challenged photographs.

In sum, although the district court erred by admitting photographic evidence that the police obtained from Barajas's cellular telephone in violation of the constitutional warrant requirement, this error is harmless beyond a reasonable doubt. Barajas is not entitled to relief on this ground.

## II.

Barajas also asserts that the three photographs recovered from his cellular telephone were irrelevant and unfairly prejudicial. Barajas raises this objection for the first time on appeal.

Ordinarily, an appellant who fails to object on a particular basis to the district court forfeits the right to object on that basis on appeal. *State v. Bauer,* 598 N.W.2d 352, 363 (Minn.1999). To overcome such forfeiture, an appellant must demonstrate that the district court committed plain error. Minn. R.Crim. P. 31.02 (stating that appellate court may consider plain error affecting substantial rights even if such error was not raised before district court); *Bauer,* 598 N.W.2d at 363 (establishing appellant's burden to demonstrate district court's error); *State v. Griller,* 583 N.W.2d 736, 740 (Minn. 1998) (applying rule 31.02). In doing so, we consider whether there is an error, whether such error is plain, and whether it affects the defendant's substantial rights. *Griller,* 583 N.W.2d at 740. An error affects a defendant's substantial rights if it was "prejudicial and affected the outcome of the case." *Id.* at 741. If the three plain-error factors are established, we next consider whether the error seriously affected the fairness and integrity of the judicial proceedings. *Id.* at 740.

Although Barajas characterizes the challenged photographs as prior-bad-acts evidence, which generally is inadmissible under Minn. R. Evid. 404(b), he does not explain how the photographs depict bad acts. Barajas's argument appears to be grounded in rule 403, which provides that relevant evidence is not admissible if its probative value is substantially outweighed by the risk of unfair prejudice. *See* Minn. R. Evid. 403; *State v. Starkey,* 516 N.W.2d 918, 925 (Minn.1994). But the challenged photographs are probative because they establish that Barajas, who was charged with first-degree possession of methamphetamine with intent to sell, possessed or had access to large amounts of money. *See State v. Collard,* 414 N.W.2d 733, 736 (Minn.App.1987) (acknowledging that a "large sum of money" may establish intent to sell a controlled substance), *review denied* (Minn. Jan. 15, 1988). The photographs also corroborate and provide context to other contested evidence that Barajas possessed and transferred large amounts of cash, namely, bank-transaction and wire-transfer receipts.

In addition, this evidence carried limited risk of causing unfair prejudice. "Unfair prejudice under rule 403 is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Schulz,* 691 N.W.2d 474, 478 (Minn.2005). Here, the challenged photographs do not depict any illegal or otherwise objectionable conduct. The inference that the state invited the jury to make from this evidence is both reasonable and relevant to the charged offense. Moreover, Barajas exercised his right to testify and used the opportunity to present his exculpatory explanation for the

challenged photographs, which diminished the potential for the jury to make illegitimate or unfair inferences from this evidence. Specifically, Barajas testified that the money depicted in the photographs was not his, the money belonged to a man named Frank, and a third party took the money after the photographs were taken.

Because the district court did not plainly err by not excluding this evidence under Minn. R. Evid. 403, we need not reach the remaining prongs of the plain-error test. *See Griller*, 583 N.W.2d at 740 (providing that all prongs of plain-error test must be met before relief may be considered). But we observe that, even if the admission of these photographs in evidence was plain error, such error did not affect the outcome of the case. *See* Part I.B., *supra* (concluding that erroneous admission of challenged photographs in evidence was harmless beyond a reasonable doubt); *State v. Tscheu*, 758 N.W.2d 849, 864 n. 18 (Minn.2008) (recognizing that harmless-error standard is higher standard than third prong of plain-error test). Accordingly, Barajas is not entitled to relief on this ground.

## III.

Barajas also argues that the district court erred by admitting in evidence Officer Torgerson's testimony regarding the characteristics of drug traffickers. Specifically, Barajas challenges Officer Torgerson's testimony regarding how seemingly innocent items such as dry milk, SD cards, prepaid cellular telephones, plastic bags and packaging materials, and receipts from bank deposits and wire transfers can be used in the sale of drugs. Because Barajas raises this objection for the first time on appeal, we also apply plain-error analysis to this claim. *See* Minn. R.Crim. P. 31.02 (stating that appellate court may consider plain error affect-

ing substantial rights even if such error was not raised before district court); *see also Griller*, 583 N.W.2d at 740 (applying Minn. R.Crim. P. 31.02).

"A drug courier profile is an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *State v. Williams*, 525 N.W.2d 538, 545 (Minn.1994) (quotation omitted). In *Williams*, police officers testified regarding the typical behavior of drug couriers, including the manner in which they purchase airline tickets, the cities from which they depart, and other typical travel behaviors. *Id.* at 548. The *Williams* court observed that such evidence is similar to character evidence because it invites the jury to infer that, if the defendant's conduct fits the profile, then it is probative evidence that he is a drug courier. *Id.* The *Williams* court concluded that police testimony regarding the typical behavior of "most drug couriers" was "clearly and plainly inadmissible." *Id.* But the *Williams* court explained that police officers may testify regarding relevant techniques employed by other drug dealers or couriers to explain the significance of certain evidence or the defendant's conduct. *Id.*

In *State v. Litzau*, an expert witness testified that drug dealers often purchase vehicles without transferring the title to their own names, hide drugs in obscure places such as in the air-cleaner compartment, and sometimes use an older vehicle to transport drugs. 650 N.W.2d 177, 185 (Minn.2002). Relying on *Williams*, the Minnesota Supreme Court held that the expert witness's testimony was "plainly inadmissible" because it was "akin to character evidence" and it exceeded the scope of the district court's pretrial ruling limiting the witness's testimony to "the quantities of controlled substances and items commonly found in [a suspect's] possession

which are indicative of the sale of drugs compared to personal use." *Id.* (quotation omitted). In doing so, the *Litzau* court distinguished drug-courier-profile evidence from the evidence permitted under the district court's pretrial ruling. *Id.*

Here, the district court did not issue a pretrial ruling limiting Officer Torgerson's testimony because Barajas did not object and seek such ruling before trial or at any time during trial. Officer Torgerson's testimony was helpful to the jury because it explained how certain items recovered from the apartment where Barajas lived could be used in the sale of drugs.[10] For example, Officer Torgerson testified that drug dealers use substances that resemble the drugs being sold, such as the dry milk recovered from the apartment where Barajas lived, as "cutting agents" to increase the volume of their product and thereby increase sales. He explained that drug dealers use prepaid cellular telephones so that they can easily switch telephones and telephone numbers to avoid being tracked by the police, and that SD cards permit drug dealers to easily move contact information between cellular telephones. Officer Torgerson also testified that large plastic bags and other packaging materials like these recovered from the apartment typically are used by drug dealers to package and transport drugs over long distances while concealing their odor. Regarding the bank-deposit and wire-transfer receipts, Officer Torgerson explained that "normally people involved in [drug-trafficking] activity will ... transfer ... funds

electronically to a person in the United States or Mexico."

Officer Torgerson's testimony established the relevance and significance of items in Barajas's possession by explaining the connection between those items and the sale of drugs. Unlike drug-courier-profile evidence, the challenged testimony does not suggest that, because Barajas possessed similar items or acted similarly to drug dealers, he must be a drug dealer. Rather, the challenged testimony assisted the jury in understanding how items that have legitimate uses also could have potentially unlawful uses or be evidence of unlawful conduct. We conclude that Officer Torgerson's testimony about cellular telephones, household items, and money-transaction receipts is not "plainly inadmissible" under *Williams* or *Litzau* because it is not "akin to character evidence." Therefore, the district court did not err by admitting Officer Torgerson's unobjected-to testimony in evidence.[11]

■ Even if the admission of this testimony constituted an error that is plain, the plain-error test also requires the error to be "prejudicial and [to have] affected the outcome of the case." *Griller*, 583 N.W.2d at 741. Here, the state demonstrated that the police recovered a digital scale and 387.2 grams of methamphetamine from the apartment where Barajas lived, from which the jury reasonably could infer that Barajas possessed the methamphetamine with the intent to sell it, rather than for personal use. *See* Minn.Stat. §§ 152.01, subd. 15a (defining "sell" to include posses-

10. Barajas also challenges Officer Torgerson's testimony regarding the street value of methamphetamine in various locations. But that testimony describes characteristics of the evidence and does not describe the behavior of either Barajas or hypothetical drug dealers. Therefore, Barajas's objection to this testimony as improper drug-courier-profile evidence lacks merit.

11. In light of this conclusion, we need not address Barajas's objection to the state's reliance on this evidence during its closing argument. But we observe that the state's references to this evidence during its closing argument were limited.

sion "with intent to" either "sell, give away, barter, deliver, exchange, distribute or dispose of to another, or to manufacture"), 152.021, subd. 1(1) (providing that sale of ten grams or more of methamphetamine constitutes first-degree controlled substance crime) (2008); *State v. Heath,* 685 N.W.2d 48, 57 (Minn.App.2004) (concluding that evidence that defendant possessed at least 13 grams of methamphetamine sufficiently supported conviction of possession with intent to sell), *review denied* (Minn. Nov. 16, 2004). The record also reflects that Barajas possessed, transferred, or deposited more than $8,000 in the short time that he lived in the Moorhead area. Moreover, even without Officer Torgerson's testimony, the jury could infer that Barajas's possession of possible cutting agents, multiple prepaid cellular telephones, packaging materials, and money-transaction receipts, together with a large amount of methamphetamine, all related to drug trafficking.

In sum, because Barajas has failed to establish that the admission of the challenged testimony either was a plain error or affected his substantial rights, reversal on this ground is not warranted.[12]

## DECISION

An individual has a reasonable expectation of privacy in the concealed contents of a cellular telephone. Because appellant's cellular telephone concealed the photographs stored within the telephone's inter-

nal memory, the investigating officer was required to obtain a warrant before searching that telephone. The district court erred by relying on appellant's subsequent written consent when declining to suppress the challenged photographs because appellant's consent was not voluntarily given, his consent did not purge the challenged photographs of the taint of the unlawful search, and the record does not support application of the inevitable-discovery or independent-source doctrines to the challenged evidence. Because the state did not demonstrate the existence of a recognized exception to the warrant requirement, the challenged photographs were inadmissible. Although the district court erred by admitting the challenged photographs, the district court's error is harmless beyond a reasonable doubt. In addition, appellant failed to establish that the challenged photographs were irrelevant or unfairly prejudicial, or that the admission of testimony about the relevance of items seized from the apartment constituted a plain error that affected his substantial rights. Accordingly, we affirm appellant's conviction.

**Affirmed.**

---

12. Because Barajas failed to satisfy the plain-error test, we need not address whether the admission of the challenged evidence seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See Griller,* 583 N.W.2d at 740, 742.